Another friendly dispute. Yes, not one I think would be successfully mediated. May it please the court, I'm John Newport representing the plaintiffs in this matter. The district court below found that the plaintiffs were likely to succeed on the merits of their safe navigation claim. The balance of hardships tipped in our favor. Plaintiffs' proposed injunction of an 800-meter safety perimeter was a manageable injunction that would likely stop the violent activities directed against the plaintiffs and that the public interest favors the rights of ships and crew to travel safely on the open seas. That's what the district court found. Where our ship foundered, so to speak, is on likelihood of irreparable harm and the public interest. Those are two factors the district court found against us. And in doing so, the district court misapplied the standard for evaluating likelihood of irreparable harm. It's hard to square the district court's findings of highly likely risk of collision with this court's decisions that hold that likelihood of irreparable harm does not mean certainty of irreparable harm. What we established in this case and what the district court found was that the defendants navigate their ships in a way that is highly likely to result in collisions. Collisions are inherently dangerous. Collisions are particularly dangerous in the waters at issue in this case. And so as a consequence of the court's findings, its conclusion that we had not established the likelihood of irreparable harm is not a logical conclusion from the facts found. That's our position on irreparable harm. It's a simple case. Violence should not be condoned. Violence inherently jeopardizes safety of ships and crew. An injunction in this case would allow an injunction with an 800-meter safety perimeter would allow the defendants to observe our activities, film our activities, protest our activities, but it would be an end to the violence which jeopardizes safety of ships and crew on the high seas. The issue of public interest is another factor that the court found against us. But in that instance, the court, again, misconstrued and misapplied the law. In injunction cases between private parties, ordinarily the public interest factor is one of neutrality. It enjoins the defendants from engaging in conduct vis-a-vis the plaintiffs. The public has no particular interest in whether the defendants may or may not commit violence against the plaintiffs. Now, that's true in a general sense. It's not true in an environmental sense, at least in the sense that, you know, if the environment is being harmed, the public is being harmed here. I'm not sure which way that cuts here. Do you have any sense of that? And if so, do you have any case that would substantiate your position? Yes. The comment in that respect is, in the ordinary environmental case, like the case the court just heard, arises in the context of statutes, which mandate that consideration of environmental impacts be taken into account in granting or denying injunctive relief. The only statutes that the court seized upon here, and without benefit of briefing by the parties, was the Marine Mammal Protection Act, which the court said in U.S. waters prohibits the taking of whales. Well, it doesn't apply to the international waters. The international waters here are controlled by the International Whaling Convention, which specifically permits the plaintiffs to do what they're doing. And so the Marine Mammal Protection Act is not a basis for a court to find public interest against the taking of whales. As a matter of fact, that act specifically grandfathers in the whale convention, which preceded its enactment. So the public interest is neutral here then from your perspective? It is neutral. And if it's anything, it is in commanding respect for the law, which again this court's cases have said that that is a component of public interest. Well, where you have the court, the district court, seizing a statute, Marine Mammal Protection Act, which contrary to what he did with it, says that whaling, which precedes it by virtue of the convention, grandfathers it, to take that statute as being the predicate for public interest for prohibiting something that the act specifically preserves, turns the public interest standard on its head. Can I ask you this in terms of the concept of complying with law? This, of course, is a very challenging case, and they get all these international treaties involved. And one of the issues we have, of course, is that there is a default injunction that came from an Australian court in joining the whaling in the Australian Whale Sanctuary, and yet we don't recognize Australia's jurisdiction over those waters. I can understand why you didn't answer the complaint here, but let's back into this. Assume, arguendo only, that Australia, in fact, did have a well-recognized right to jurisdiction over the waters in question, and the injunction in question were there. Would that make any difference in our evaluation of the public interest? I don't believe so. And the reason I say that is because the interest at issue here is the ability of the plaintiffs to engage in lawful activity without being threatened by unlawful violence. Those are the two things that must be compared against one another. And should that be evaluated under public interest? I mean, there are two important moral issues, compliance with law and, from the strong view of others, the violence against these animals that are somewhat endangered. How are we supposed to evaluate that if we are to evaluate those? I don't believe it's a proper comparison. This is, in our view, a safety at sea case. The question is, may people who are entitled to engage in lawful behavior, may a woman visiting an abortion clinic be permitted to visit the abortion clinic without the threat of running a gauntlet of people throwing bottles or otherwise interfering with her lawful activities. In our view, this is how this case should be evaluated. And that is why the district court, when the district court sees this international political overtones as some basis for denying relief, strayed from the mark. Because, again, in the abortion context, the idea that the Vatican and many countries in the world oppose abortion, that is not a reason for a district court denying substantive rights to people who come into court and establish them. Could you address for a minute the piracy claim? The district court, of course, did not permit you to amend. What's your best case for our sending that aspect back to permit you to amend on the piracy claim? Well, there were several cases cited in our brief that stand for the proposition that where a court, without notice, turns a motion to dismiss into a summary judgment motion, that's clear, reversible error. Yeah, but the district court, I think, based that on two separate grounds, right? Yes. And one ground was a question of law. Yes. Actually, they were both questions of law. So if we agree with the district court on the question of law, an amendment would be hew, right? You couldn't amend. No, because one of the amendments, there are two components to the Piracy Act claim, private ends and violence. The theory of the complaint on private ends was simply that the defendants were pursuing a private end of trying to protect marine wildlife. That's what I'm getting at. If we agree with the district court's interpretation as to what private ends means or disagree with you, then it would be hew to try to amend, right? The alternative private ends, which was not a theory of the injunctive relief and was not in the complaint at the time of the case, was that they pursue these activities for financial gain, which the district court recognized was a prototypical piracy sort of thing. And we could just as easily be permitted to amend to say what these defendants do is engage in this conduct to raise millions of dollars to finance their activities, to provide the plaintiff, the defendant, a comfortable living, and we would be entitled to pursue a piracy claim on that basis. Unfortunately, we did not have authority before the district court like we have authority before you, the Castle John case, in which Belgium's highest court, on basically the same sort of situation, held that private ends were satisfied by an environmental group engaging in violent environmental protests to publicize what they thought was. So that gets back to my question. If we decide as a matter of law that you fail on the private means and private ends test, then it's futile to amend, right? If this court were to disagree with the Castle John, that aspect of private ends would be foreclosed from us. The other aspect of private ends would not be foreclosed from us, and that is- You mean the financial gain? Yes, which is something that we could pursue by way of amendment. But like I say, the district court didn't have the benefit of the Castle John case. This court does. And the district court didn't have the benefit of basically the legislative history behind the adoption of the piracy claim. And so I think the district court was wrong in saying that piracy was not a basis for injunctive relief, but was doubly wrong in dismissing it without the opportunity to amend. The other claim, which we haven't talked about yet here this morning, is what I call the SUA claim, in which the district court said that we had not established a likelihood of success on the suppression of unlawful acts against maritime navigation. And that claim focused on the concerted prop fouling, which the defendants admit that they engage in and which we demonstrated to the district court, at least at one instance, disabled partially a ship at sea. And does it even matter that you've demonstrated that that has occurred if the intent of the parties, admittedly, is to foul the props and disable the ship? No, the district court did not address at all the aspect of the treaty, which says attempts to prop foul. There's a separate part of that, right? And so if you look at the attempt component or you look at the accomplishment component, we established both and we established attempts in spades. And each year the defendants have used different means of attempting to foul the props of the ships. First they used narrow ropes. Then they used bigger ropes. And then they used ropes interlaced with metal. And then they used wire. And then they used wire wrapped around ropes.  But they had a metal device that was about this big and this big around tied to a rope, which did get wrapped around one of the ship's propellers. And they heard that constant banging against the side of the ship as it spun around. And so that activity in these waters is inherently dangerous. And they attempted time and time again. And the simple solution to all of this was the grant of an 800-meter safety perimeter, which would be based on the district court's finding that the defendants engage in activity highly likely to result in collisions. And it would balance their desire to engage in their behavior, but do so in a nonviolent way that would allow the plaintiffs to move around on the high seas free of the risk of violence. I'd like to observe the balance of my time for rebuttal. Okay, thank you. We'll hear from the other side. Good morning, Your Honors. My name is Dan Harris, and I'm here today on behalf of the defendants, C. Shepard and Paul Watson. Violence is not to be condoned, and the district court did not condone violence. The Whalers were not entitled to a preliminary injunction for the simple reason that they did not satisfy the winter requirements for a preliminary injunction. Which factors do you claim they did? It's a four-factor test. Which factors did they not satisfy? Most importantly, they did not satisfy the requirement of a likelihood of irreparable harm. Wow, sinking a boat at sea, people could drown, sounds to me like likelihood of irreparable harm. Your clients are deliberately engaging in activities that put vessels and people on them in harm's way. I don't see how, given the district court's other findings, how you could conclude that the harm, if it were to occur, wouldn't be irreparable. C. Shepard is not engaging in those tactics. C. Shepard has never sunk a ship with anyone on it. Has rammed ships with other ships? C. Shepard has not rammed any ships belonging to the Whalers. Has rammed ships? I'm not sure whether it's rammed ships, but there's certainly no evidence in this case that it's rammed ships. That's correct. I'm not sure because it's my understanding that they have not, but there was no evidence that they ever did. Well, that's not the issue, is it? There's the controlling, I think it's a treaty, it also talks about attempting, and in this case, clearly, repeatedly, there have been attempts to disable the ship. And the point is that if you're in, as the Shackleford situation would readily attest, if you're in those very dangerous waters at certain times of the year and you have a disabled ship, you could put everybody at risk. Well, hypothetically, maybe, but C. Shepard has been out there for 30 years. You're just saying they weren't successful. They were the keystone cops. What does that have to do with this? Well, it has everything to do with it. If I were to stand here right now and say that I want to rob a bank, but then never leave this room, I don't think that anyone would say that's an attempt. But they have left the room. Well, they have left the room, but barely. What kind of comparison is that? Well, it's a comparison in the sense that the whaling ships, the whaling vessels... You think an attempt to fall a propeller is a dangerous activity? In this situation... Even though you've never been successful at disabling the ship's rudder? In this situation, it is not a dangerous activity. Why? Because the whaling ships are state-of-the-art vessels that have all sorts of anti-prop fouling devices on them. What does that have to do with anything? Banks have all kinds of anti-theft situations as well. They mark the money and so on. But in your example, if they go to the front door and they bash through the window and they throw a bomb in or they do something like that and they're not successful, they still tried to rob the bank. Well, I don't think that's the correct analogy. It would be like throwing a plastic bomb or it would be like throwing a toy bomb into a bank. There's no way it could ever harm anyone. Are you representing to the court, as an officer of the court, that your clients have not repeatedly tried in the hope that they would be successful to file props? Is that what you're representing? No, because I don't know what the intent of my clients has been when they have employed prop fouling. Counsel, that is so disingenuous. I can't believe you're here making that argument. Well, the argument I make, the reason I don't know what their intent is, is because they've never come close to succeeding. Does it make a difference if they're engaged in prop fouling? Yes. No, I don't think it does make a difference. Why are you arguing it? Well, because I was simply responding to a question. I think what makes a difference is the fact that no matter what Sea Shepherd has done, there's no evidence that they've ever come close to fouling a prop, and there's no evidence that even if they did. What about the provision then in the convention about attempts? By definition, an attempt does not have to be successful. Well, it has to have some reason. It violates the attempt clause, doesn't it? It depends how you define attempt. An attempt has to have some reasonable probability. Well, under ordinary criminal law. Yeah, if this were a criminal case and it went to the jury, it certainly says there's plenty of evidence there to support a verdict of attempt, a verdict of guilty for attempt. Let's assume for a moment then that there is plenty of evidence for attempt. There still would not be, there's still not sufficient evidence of the likelihood of irreparable harm because no evidence was submitted that an attempt could ever irreparably harm individuals. An attempt might, or a successful attempt. You damage a ship at sea, you disable it from moving when there's possible storms. I mean, this is playing with life. And moreover, in Winter, which of course is the four-party test, the four-factor test that Judge Toshima made reference to, the court indicated that the party seeking the relief must prove that, in quotes, irreparable injury is likely. Correct. They don't have to show that it's occurred. And in this case, you've got repeated evidence of attempts escalating all the time, trying to foul the rudders given the nature of where these folks are located, the storms and so on, all of which we can take into account. Doesn't that clearly satisfy that aspect of Winter? No, it does not because we also have evidence that Sea Shepherd has engaged in these same tactics for the last nine years, and there is evidence that every season, Sea Shepherd makes an effort to make its next season safer than the next. Wait, wait, wait, wait, wait. Make its next season safer than the next? I'm sorry, make its next season safer than its last. Safer for whom? Safer for everyone. Come on. You mean to try to increase the likelihood of fouling the props, and that is an attempt to make it safer for everybody on board that ship? No. If they really want to make it safer, they just wouldn't go at all. Well, that's true. What are they trying to accomplish? If having these efforts to foul the propeller are not designed to be successful, what exactly are they – I mean, they're trying to foul the propeller, right? I'm not sure. They're certainly putting something – You're not sure? They're putting – well, they're putting items in the way of the propeller. What they're trying to do is slow down – To help it move faster? Trying to slow down the vessel. And what they're trying to do is stop whaling. They're certainly not trying to injure anyone. Well, but disabling a ship at sea is a dangerous enterprise. I mean, if it can't move, it can't maneuver, it can't – If the waves come up, you know, without a working propeller, that's a very dangerous thing to – I don't see how you can disconnect the two. Well, it – They don't have sails, you know, that can maneuver without the use of a propeller. Well, the whaling vessels are out there as a team. There has never been any incident where any of the whaling vessels have been slowed down. There's never been an incident where any whaling vessel has ever had its engine stopped. Well, that's because you weren't successful, not because you didn't try. Let's talk about piracy. Why isn't the district court wrong about piracy? Why are they not wrong? Why isn't the district court wrong? Because the district court looked at the universal standards on piracy, and those standards require violence for private ends. And essentially – Well, why are these private ends? Well, to – There's no government sponsorship for what you do, what your clients do, right? That's correct. So why isn't that, per se, a private end? Well, because the universal standard for piracy relates to theft. It relates to stealing. It relates to taking assets. It relates to trying to make money. There's lots of stuff that falls within the core of a prohibition, but the prohibition is not termed in terms of financial enrichment. It says private ends. And private ends could be people's views and people's beliefs are often more valuable than private property. And who are we to judge whether property is more important? The important thing is that these are not public ends. Your clients have a view of life, and they try to pursue that by damaging other people's property. Let's see. I don't see how this doesn't meet the definition of piracy. Sea Shepherd's goals might be – Sea Shepherd itself might be private, but its goals and what it's seeking to achieve are public in the sense that their goals are to conserve the ocean's resources. But that's the same argument as the abortion clinic that opposing counsel raises, is it not, where people are saying, you know, we want people to have the right to have an abortion without interference by people. And I'm not talking about who's right or wrong. It has nothing to do with that, just the principle. There's a constitutional right to have that. Some people get out there. Some people even murder doctors who perform these. They throw bricks. They throw whatever. And they both believe very strongly in what they're doing. But the reality is that it's the law that's going to determine who can do what in the context. And that's what we're wrestling with here is not whether your clients are, in quotes, right about what they're doing. Whatever our personal views may be is really irrelevant here. We really have to look at what international law and our law says about this and determine whether the winter factors have been satisfied. And in this case, the piracy definition. Exactly. And in the abortion context, there is no such concept as private ends. But this matter is very different than the abortion cases because here we're not dealing with a clear law. We're not dealing. No, but you are. They are authorized to conduct their activities pursuant to a license granted by Japan, which is authorized by international treaties to which we are parties and we recognize. There is none out there doing something unlawful. I'm not even sure that if they were doing something unlawful, you as a private party could turn that into public ends by saying we're going to stop it. But in this case, they happen to be doing something that's entirely unlawful and your clients don't like it. I don't see how that isn't pursuing private ends. You pursue your own vision or your clients pursue their own vision of what's good for the public. Well, private ends as defined by piracy has implications of theft. It always has. And the court looked at the cases out there. When they had the October Revolution in Soviet Union, they called it revolution rather than theft. But, you know, what they did is they basically took away private property. That was, you know, so you can call anything anything at all. But what happened there was theft and what happens here is private violence. I don't see how you can redefine it to something else. Well, we're not redefining it. We're looking at the universal standards, and the universal standards have over history looked at piracy as taking pieces of eight. But also in this situation, there's very little case law regarding the definition of private ends. And the only case that the Whalers have cited is the Castle John case, which is from Belgium in 1986. And so that hardly constitutes a universal norm, which is what is required for a piracy claim. What about our Sarai versus Rio Tinto case? We found, took some terms that you may not think were very well defined in terms of protected groups and genocide and the like, and found that, in fact, this was a protected group. What's the difference between that concept and the one you're advocating here? Well, again, it just gets back to universal norms. And universal norms do not say that Sea Shepherd's actions or actions like that constitute piracy. Piracy is typically viewed as using violence to steal. Okay, if there are examples that are broader than that, then you lose on that issue, do you not? Well, it depends how broad they are. If they're broad enough to cover what's occurring here. Let's say, for example, that, and then this is just a hypothetical, that the Japanese Whalers will say, we have a right under a permit, under international law, to do what we're doing. You are stealing our permit. You are rendering it ineffective by what you're doing. Is that property? Probably, but still even that's not necessarily a universal norm. And in speaking about universal norm, it's not fair to only look at one side of it, because the other side must be considered as well. And the other side is that the universal norm is against whaling. And it is not correct to say that what the whalers are doing is clearly legal. How can you say that? They've got a permit, a valid permit and a valid treaty. How can it be a universal norm when they're operating, in fact, within the confines of actual positive law that authorizes them to do what they're doing? That law is based on what occurred back in 1946, back when there was commercial whaling and there was an allowance for whaling. So what? It's a law. If the law is repealed, then we'll have a different regime. It's a law that's still in effect. It's a treaty to which we're parties. Treaties can be repealed. Laws can be changed. But right now the law is valid, right? Well, right now… The law is valid. Right now the law is valid. Yet the whalers violated Australian law by going into the Australian whale sanctuary. The U.S. government, the New Zealand government, the Australian government, various governments have condemned the whaling that has gone on. But we also do not recognize Australia's jurisdiction over that area, do we? We do not recognize Australia's jurisdiction over that entire area. We do recognize Australia's jurisdiction over part of it. So if the Russians claim the North Pole and some of our military go in there to do exploration to see how deep things are and they are arrested and the Russians take all of their equipment and everything, claiming they're violating their territory,  because they have no jurisdiction there that we recognize? Certainly we would have an objection. But that is not what is going on in this case. The Australian court order is relevant to this case because it shows, number one, that the fact that it indicates the universal norm is against whaling. But what it also shows is… I don't understand that. Why doesn't it just mean that that's Australia's view? Well, it could just be Australia's view, but it's also the view of numerous other nations who have made clear that is their view. The United States, among them. They can revoke the treaty. Countries can easily do that. They can just say we're not going to be part of this treaty anymore and revoke it. There may be no need to revoke the treaty because Australia has brought an action in the International Court of Justice to stop this specific whaling as being violative of the treaty. Mr. Harris, you only have about a minute left. Give me one minute's worth of why the public interest factor should be decided in your favor. The public interest factor should be decided in Sea Shepherd's favor for the very same reasons given by the district court. Ocean conservation, number one. And number two, there is no reason why… What about the case law that says in a suit between private parties, usually the public interest is a neutral factor? This is not that kind of case. Why not? Why? Because the world is watching. The world cares. The oceans are not… The ocean is not a private party. Countries are bringing lawsuits over this. The executive branch has spoken out about it. You're asking us to decide a lot more than this case, aren't you? You think we should outlaw whaling? No. Well, no, I do not think this court should outlaw whaling. Why isn't the public interest a neutral factor in this case between private parties? Because if this court issues an injunction, it will be stepping into an international controversy. And it will be stepping into an international controversy. Is that a reason to not exercise judicial power? Because you might be stepping into a controversy. It is when the executive branch has already expressed its views on this controversy, and the most recent statements from the executive branch are condemning whaling. And they've said that it's okay to go out there and put vessels into danger? No, they have not said that. Okay, thank you. Thank you. The executive branch isn't the authority which gets to determine whether or not people have substantive rights which are entitled to enforcement in a court of law. The executive branch, for political reasons, may not want to take action. But that doesn't mean a court, when confronted with facts which entitle somebody to protection of their substantive rights, shouldn't act. In this case, the U.S. government decries violence in pursuit of the defendant's beliefs. The U.S. government has not filed an amicus brief in this case, has it? No, it has not. To your knowledge, has anybody asked them to do so? We have not, and to my knowledge, the defendants have not. So for our purposes, since the government is silent in respect to this case, what should we assume, that it either has not made up its mind on it, that it has one view or another, but doesn't feel strongly enough about it to express it, or just what? It's hard to discern why the executive branch does or doesn't do what it does or doesn't do. It hasn't done anything. Does it have the opportunity to do so? Certainly it does. But when I made the point that the executive branch decries violence, I was referring to the U.S. Department of State's public announcement, which was joined by New Zealand, Australia, and the Netherlands, when these ships last went to sea in December of last year, which said, we decry violence on the open seas. We do not want to see dangerous behavior which jeopardize life and property, despite our opposition to whaling. So the executive branch has gone on record, at least in this case, as saying, while we oppose what the plaintiffs do, we likewise oppose the defendants engaging in violent behavior to try and force their beliefs onto the plaintiffs. Where is that in the record? Do you have a site for us? That is at the ‑‑ well, yes. The site is ER 136 Note 2, which is a citation to the web page, where if you pull this up, you'll find it. And also in the record at ER 175 through 176 is the International Whaling Convention's public announcement, which is to the same effect, which is, we decry violence. So the issue isn't whaling. The issue is safety at sea. I think we understand. Thank you. Case just argued. We'll stand submitted. Okay. We'll next hear argument of the last case on the calendar. Shell Offshore, Inc. vs.
judges: Kozinski, Tashima, Smith